UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------X

In re:                                                                    Chapter 7

Maxsun Produce Corp,                                            Case No. 13-42875-nhl

                    Debtor.

----------------------------------------------------------X

John S. Pereira, as chapter 7 trustee for the
estate of Maxsun Produce Corp.,

                    Plaintiff.

v.

Johnny S. Lin, individually and as an officer
and director of the Debtor, *aka* Hesong Lin,
Maxsun Corporation,
Maxsun Packaging Corp**.**                                    Adv. Pro. No. 17-01034-nhl
Maxsun Furnishings of NYC, Inc.,
Maxsun International Inc.,
Master Packaging Corp.,
and Micarole Enterprises Corp**.,**

                    Defendants.

----------------------------------------------------------X

## DECISION AFTER TRIAL

**<u>Appearances</u>**:

John P. Campo                                 Zheng Gao
Steven Mark Cordero                       Kevin K. Tung
Scott M. Kessler                               Kevin Kerveng Tung, P.C.
Akerman LLP                                   136-20 38th Avenue
666 Fifth Avenue                             Suite 3D
New York, NY 10103                       Flushing, NY 11354
*Attorneys for Plaintiff*                   *Attorneys for Defendants*

HONORABLE NANCY HERSHEY LORD
UNITED STATES BANKRUPTCY JUDGE

## INTRODUCTION

Plaintiff John S. Pereira, as chapter 7 trustee (the "Trustee" or the "Plaintiff") for the estate of Maxsun Produce Corp. ("Maxsun Produce" or the "Debtor"), commenced an adversary proceeding (Adv. Pro. No. 17-01034-nhl,  the "Adversary Proceeding"), by filing a complaint (the "Complaint") against Johnny S. Lin *aka* Hesong Lin, individually and as an officer and director of the Debtor ("Lin"), Maxsun Corporation, Maxsun Packaging Corp., Maxsun Furnishings of NYC, Inc., Maxsun International Inc., Master Packaging Corp., and Micarole Enterprises Corp. ("Micarole") (collectively, the "Defendants"), alleging against Lin, alone, a breach of fiduciary duty, and against all the Defendants, fraudulent conveyance transfers under New York Debtor & Creditor Law ("NYDCL") §§ 273, 274, 275; unjust enrichment; and theories of alter ego and corporate veil piercing. Complaint, Adv. Pro. No. 17-01034-nhl, ECF No. 1. The Defendants moved for summary judgment on October 29, 2017, which motion was denied. *See* Order Denying Summ. Judgment, Adv. Pro. No. 17-01034-nhl, ECF No. 44. Thereafter, the Court held a trial over the course of three days. Trial Tr., February 11, 2019, ECF No. 51 ("2/11/19 Tr."); Trial Tr., February 8, 2019, ECF No. 50 ("2/8/19 Tr."); Trial Tr., January 31, 2019, ECF No. 48 ("1/31/19 Tr.").   Subsequently, the parties submitted post-trial briefs, and the matter was taken under advisement. *See* Pl.'s Post Trial Mem., Adv. Pro. No. 17-01034-nhl, ECF No. 54; Def.'s Post Trial Mem., Adv. Pro. No. 17-01034-nhl, ECF No. 55.

For the reasons set forth below, the Court has concluded that the Plaintiff has not established a prima facie case with respect to any of the causes of action in the Complaint.

## JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b), and the Eastern District of New York standing order of reference dated August 28, 1986, as amended by

Order dated December 5, 2012. This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (H). The following are the Court's findings of fact and conclusions of law to the extent required by Rule 52, as made applicable by Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 7052.

## FACTS

### A. Beginnings of Maxsun Produce

Maxsun Produce was a produce wholesale company established in 2008 by lead Defendant Lin, Jian (Thomas) Qi ("Qi"), and Brian Cho ("Cho"). *See* 1/31/19 Tr. 33:17-34:6. At the time, Qi, who Lin had known for approximately ten years, was a manager at Southeast Produce Company, a "major [produce] player in the Asian community." 1/31/19 Tr. 36:4-6; *see* 2/11/19 Tr. 109:24-25. Cho, who Lin was not previously acquainted with, owned and was the sole officer of a Korean wholesale company, Veg Blue. 2/11/19 Tr. 109:6-11; 1/31/19 Tr. 36:11-13.

While Lin did not have experience in the wholesale produce business, Qi and Cho sought to include him in the venture because Lin had financial resources and a general business expertise. *See* 2/11/19 Tr. 112:23-25 ("[Cho]: [Lin was] the one with the money"); 1/31/19 Tr. 33:21-23 ("[Lin]: They [were] looking at credit in order to sign a lease."). Lin was the president and owner of Micarole, a poultry and meat wholesale business that he established in 2000. 1/31/19 Tr. 29:17-21, 29:24, 30:18, 31:13-18. To date, Lin remains the president, sole officer, and owner of Micarole. 1/31/19 Tr. 31:7-18.   In addition, Lin established and ran various other companies, including Maxsun Corporation, Maxsun Packaging Corp, Maxsun Furnishings of NYC, Inc., and Master Packaging Corp. 2/8/19 Tr. 88:2-8; 2/11/19 Tr. 34:17-18; 1/31/19 Tr. 157:25-158:15.[1]

---

[1] Only two of Lin's businesses, Micarole and Maxsun Corporation, remain operating. 1/31/19 Tr. 97:20-98:1.

In October 2008, Lin, Qi and Cho consummated the Maxsun Produce shareholders' agreement (the "Shareholders' Agreement"). Pl.'s Ex. 2, D00002.  Initially, Lin purchased 50% of the shares (100 shares) for $250,000, which funds came from Micarole, Cho purchased 30% of the shares (60 shares) for $150,000, and Qi purchased 20% (40) of the shares for $100,000. Pl.'s Ex. 2; 1/31/19 Tr. 43:5-6. The Shareholders' Agreement provided for Lin to be President, Corporate Secretary, and Director, and tasked with Accounting & General Management; Cho, Vice-President and Director, and responsible for purchasing; and Qi, Vice-President and head of sales and marketing.  Pl.'s Ex. 2, D00007-D00008.

Although Qi signed the Shareholders' Agreement, he did not have the funds to purchase his shares, leading Lin and Cho to each loan Qi $50,000. 2/11/19 Tr. 116:3-11; 1/31/19 Tr. 43:21-23; Pl's Ex. 3. The money Lin loaned to Qi came from the assets of Micarole. 1/31/19 Tr. 44:4-7.

Over the following year, Qi did not make any payments to Lin or Cho on account of the loans. 2/11/19 Tr. 116:16-17; 1/31/19 Tr. 52:1-2. Nonetheless, in late 2009, Qi approached Lin seeking to purchase additional shares in Maxsun Produce. 2/11/19 Tr. 119:23-120:1; *see* 1/31/19 Tr. 59:18-60:3. Lin agreed, testifying that he thought Qi would be incentivized to maximize sales if he owned more of the company. 1/31/19 Tr. 59:20-60:3. Accordingly, on December 1, 2009, the shareholders executed an amendment to the Shareholders' Agreement, reflecting a transfer by Lin of 20 of his shares to Qi for the purchase price of $100,000. Pl.'s Ex. 7, D00015; 2/11/19 Tr. 119:19-21; 1/31/19 Tr. 59:8-11. As a result, Lin owned 40% of the company, Cho owned 30%, and Qi owned 30%.  Pl.'s Ex. 7, D00015.

Again, Qi did not have the funds to purchase the additional shares and, once more, Lin offered Qi a loan. *See* 1/31/19 Tr. 59:5-9. The parties executed a promissory note, whereby Qi promised to repay Lin $100,000 within two years. Pl.'s Ex. 6. The loan was secured by Qi's "property,

assets, merchandise and auto." Pl.'s Ex. 6. Qi never repaid Lin the money he borrowed to purchase his original shares or any portion of the $100,000 promissory note. 1/31/19 Tr. 66:18-19.[2]

### B.  Lin as President of Maxsun Produce

The evidence and testimony reflect that during Lin's time as President of Maxsun Produce, Micraole and Maxsun Produce engaged in various intercompany transactions. Pl's Ex. 4; Pl's Ex. 5; Pl.'s Ex. 18; Pl.'s Ex. 31.

For example, on November 21, 2008, Lin, as President of Micarole, signed a guaranty agreement, guaranteeing Maxsun Produce's warehouse lease. Pl.'s Ex. 18; 1/31/19 Tr. 33:22-34:5. Additionally, at a shareholders' meeting on February 24, 2009, the parties approved a transaction whereby Lin, through Micarole, lent $200,000 to Maxsun Produce. Pl.'s Ex. 4; 1/31/19 Tr. 53:11-13. Maxsun Produce repaid Micarole before Lin's departure in 2010. *See* 1/31/19 Tr. 53:24-54:8. Moreover, Micarole sublet about 20% of Maxsun Produce's warehouse space, located at 310 Meserole Street, Brooklyn NY 11206, beginning in 2009. Pl's Ex. 4; Pl.'s Ex. 5. Lin testified that this transaction, which was approved by Qi and Cho at a shareholders' meeting on February 24, 2009 and subsequently reflected in a sublease agreement executed on June 18, 2009, was necessary because Maxsun Produce could not afford the rent on its own. Pl's Ex. 4; Pl.'s Ex. 5; 1/31/19 Tr. 32:14-22. Additionally, on occasion, Maxsun Produce purchased Micarole's used equipment for higher than market prices, according to Cho's testimony. *See* 2/11/19 Tr. 159:11-18, 160:12-16.

In addition to Lin's role as President, Lin was also in charge of Accounting & General Management. Pl.'s Ex. 2. To aid him in this task, he installed some staff members that also performed work for Micarole. For example, his niece worked as bookkeeper for both companies,

---

[2] Lin ultimately sued and obtained a default judgment against Qi in the amount of $150,000. However, he has not been able to collect on this judgment. 1/31/19 Tr. 69:2-22; Pl. Ex. 8.

and Lin hired Peter Cheng, who had done accounting work for Micarole and Lin personally, as accountant for Maxsun Produce. 2/11/19 Tr. 7:2-16, 124:13-15.

### C.  Lin Resigns

In August 2010, Cho and Qi requested a board meeting. 2/11/19 Tr. 125:19-21. According to Cho's testimony, Cho and Qi wanted more transparency surrounding Lin's handling of the company's finances. *Id*. at 123:11-13, 124:3-9; 125:17-21. In particular, Cho and Qi were not receiving dividends and wanted access to the company's bank account and books and records. *Id*. at 123:11-13, 125:17-21; 2/8/19 Tr. 114:18-23.

Lin testified that around the same time he had begun contemplating a resignation from Maxsun Produce. 2/8/19 Tr. 91:7-12. Not only was Maxsun Produce turning out to be a poor investment, but his main business, Micarole, was suffering losses as well. *Id*. ("[Lin]: I spent a lot of time and energy into [sic] Maxsun Produce and [Micarole] was starting sliding down [sic], and I afraid . . . . I take some time, and bring up [Micarole].") For example, from 2009 to 2010, Micarole's ordinary business income decreased from $495,701 to $359,906. Pl.'s Ex. 19, D11095, D11172.

As such, a board meeting was held on August 16, 2010, where Lin resigned as President and Qi was appointed in his place. Pl.'s Ex. 11; 2/11/19 Tr. 150:21-22. Specifically, the board minutes provide that:

> The Chairperson called the meeting to order and then advised that all of the shareholders had requested that the Corporation approve of the resignation of Mr. Johnny Lin as President of the Corporation and elect Mr. Jian Qi to replace Mr. Johnny Lin as President of the Corporation.

Pl. Ex. 11.

The minutes were signed by Lin as President and Secretary. This was followed by a letter signed on the same day, stating that "I [Lin] wish to tender my resignation as President of the Corporation with effect from August 16, 2010." Pl's Ex. 10.

While it is clear Lin stepped down as President, there is no written record that he resigned as Secretary or Director. *See* Pl.'s Ex. 2; Pl's Ex. 11. Lin testified that he did not understand the difference between these positions, and that his intent was to step down from *all* officer and director roles at Maxsun Produce. 1/31/19 Tr. 78:9-11, 80:5-6 ("[Lin]: [W]hen I resign the [sic] president, to my understanding, I resign everything . . . if I quit my presidency, that meaning [sic] I quit everything.").

Regarding Qi's new role, Lin testified he was comfortable appointing Qi as President given that he had over ten years of experience in produce sales, and "in the wholesale business, mostly it's sale and purchase." 1/31/19 Tr. 87:3-5. Moreover, Lin was convinced of Qi's "willing[ness] to do the business" and his "confidence in what he [could] do or . . . manage." *Id.* at 86:22-25. Cho claimed he did not seek the appointment because of his language barrier with most of the customer base and employees. 2/11/19 Tr. 126:1-5.

### D. Lin Allegedly Transfers Shares

Lin testified that shortly after he resigned, he no longer wanted to be a shareholder of Maxsun Produce. *See* 1/31/19 Tr. 139:3-16. Accordingly, on September 7, 2010, Lin allegedly entered into an agreement transferring his remaining 40% interest (80 shares) in Maxsun Produce to transferee Maxsun International (the "Stock Transfer Agreement"). Pl.'s Ex. 13.[3]

---

[3] The Shareholders' Agreement governs the transfer of Maxsun Produces' shares. Specifically, sections 9(a) and (b) provide that:

    (a)  Upon receipt by the seller of the down payment due thereunder, if any, the shares which are the subject of such transaction shall be endorsed in blank and delivered to the attorney for seller for retention in escrow upon the further terms hereof.

    (b)  Upon payment of the balance, if any, of the purchase price due the seller of such shares, record and beneficial ownership of such shares shall be transferred to the purchaser(s) and the certificates therefore shall be delivered to the purchaser(s)

Pl's Ex. 2, D00005.

Although the Stock Transfer Agreement provides that Maxsun International was the transferee of Maxsun Produces' shares, Lin asserts that the actual purchaser was Yi Chen ("Chen"), a friend from his hometown who operated a car service in Flushing, New York. 1/31/19 Tr. 99:13-22; 105:24-106:8. Lin explained that while Chen was interested in purchasing Lin's shares, Chen did not want to own them personally, but through a holding company so that others could join him in the investment. *Id*. at 99:13-17. Upon learning this strategy, Lin allegedly offered Chen ownership of one of his inactive companies, Maxsun International. *Id*. at 99:18-22. Lin formed Maxsun International in 2009 with the intent of creating an import-export business. *Id*. at 96:1-5. However, his hopes for the company never materialized and, as such, Maxsun International never held stock, engaged in business activity, or opened bank accounts. *Id*. ([Lin]: "It's just a shell"). Lin testified that he offered Chen the company as a favor because it would save Chen about $400 in registration fees. *Id*. at 99:18-22, 100:6. It does not appear the parties ever recorded this transfer of ownership. However, Lin testified that Chen was the owner of Maxsun International at the time of the execution of the Stock Transfer Agreement. *Id*. at 101:7-10, 111:10-12.

The Stock Transfer Agreement provided that Lin would transfer 80 shares to Maxsun International for $400,000. Pl's Ex. 13, D00025-D00026. This consideration was to be paid by a cash deposit of $160,000, which had allegedly already been received, with the $240,000 balance to be remitted by bank check or certified check at the time of closing. *See id*.; 1/31/19 Tr. 112:10-25-113:3, 120:21-22. Lin highlighted that the purchase price was based on the parties' "mutual agreement." 1/31/19 Tr. 105:2-3. Accordingly, Lin, individually, and Chen, as signatory for Maxsun International, executed the Stock Transfer Agreement. Pl's Ex. 13.

Lin testified that prior to signing the Stock Transfer Agreement, Chen paid Lin $160,000 in cash. 1/31/19 Tr. 112:10-25, 120:21-22. While there are six deposits allegedly evidencing this

transfer, the deposits do not total $160,000. Pl.'s Ex. 14. Lin testified it was not customary for Micarole to deposit all of the cash it received because the company kept certain amounts of cash on hand. 1/31/19 Tr. 115:12-21. Lin received the $240,000 balance through a promissory note executed on September 7, 2010, whereby Lin loaned Chen $240,000 to be repaid by November 6, 2010.[4] Pl.'s Ex. 13; Pl's Ex. 16. Chen never satisfied this debt. 1/31/19 Tr. 133:16-17.

### E. Post-Resignation Transactions and Income

Lin testified that subsequent to his resignation, he did not take part in and was unaware of the day-to-day operations of Maxsun Produce. 1/31/19 Tr. 144:1-9. Lin stated he did not sign any checks on behalf of Maxsun Produce, although he was not removed as an authorized signatory for the company's bank account until May 16, 2011. D's Ex. M; 2/8/19 Tr. 79:25-80:4. Cho further testified that after Lin's resignation, he did not see Lin in control of the company's finances. *See* 2/11/19 Tr. at 157:4-10. About a month after Lin resigned, Lin, Cho and Qi went to East-West Bank to arrange for Cho and Qi to be granted access to Maxsun Produce's bank account. 2/11/19 Tr. 123:10-21, 143:16-25.

Lin continued to use Maxsun Produce's offices for about two to three months after his resignation because Micarole was still subletting a portion of Maxsun Produce's warehouse. *Id*. at 126:22-25; 2/8/19 Tr. 60:8-20. In March 2011, Micarole's sublease expired and Micarole relocated to 57-11 49th Place, Maspeth, New York. *See* 2/8/19 Tr. 60:19-20; 1/31/19 Tr. 31:19-21.

Micarole's business ledger does not reveal transactions between the two companies during the year of 2011, which conclusion is also supported by the testimony of Cheng, accountant to Lin, Micarole, and Maxsun Produce. *See* Pl.'s Ex. 31; 2/11/19 Tr. 7:2-16. Specifically, when asked about a receivable on Micarole's balance sheet, Cheng explained that the line item represented an

---

[4] The promissory note does not provide that the loan is for the purchase of shares.

amount paid by Micarole to Maxsun Produce carried over from a previous year. 2/11/19 Tr. 87:23-25; *id.* at 88:19-23 ("Q: . . . [D]uring the year 2011, by looking at [Micarole's] ledger, can you tell is there [sic] any transactions between Maxsun Produce and Maxsun – [sic] Micarole Enterprise? A: No.").

Micarole's interim balance sheets dated June 30, 2011 and April 30, 2013, also do not evidence any transactions between Micarole and Maxsun Produce. *See* Pl.'s Ex. 38, Pl.'s Ex. 39; 2/11/19 Tr. 80:20-25. While both documents include a line-item for "accounts with affiliates," there is no breakdown of amounts owed by each affiliate. Pl.'s Ex. 38, Pl.'s Ex. 39. This is also supported by the testimony of accountant Cheng who stated that "[b]y looking at [the interim balance sheets], I cannot distinguish whether Maxsun Produce owed [] money to Micarole because [the affiliate line item is] just a one lump sum . . . ." 2/11/19 Tr. 80:20-25. Cho's testimony also strengthens this finding, as he stated he did not see Lin transfer money from Maxsun Produce to any of Lin's affiliated companies after his resignation. *Id.* at 157:4-10.

### F. *Maxsun Produce Files for Bankruptcy*

In 2012, Maxsun Produce's finances went significantly downhill. In September 2011, the Debtor reported $29,650,404 in revenue, $1,725,151 in gross profits, and $1,161,927 in total assets. Pl's Ex. 20, D00477, D00481. However, two years later, the Debtor's assets had dropped by about 94%. Voluntary Petition, Case No. 13-42875-nhl, ECF No. 1.

Cho testified that during Qi's time as President, Qi's business strategy was to purchase a surplus amount of produce, wait until the price of the produce increased, and then sell the produce for a higher profit margin. 2/11/19 Tr. 129:7-17. However, this strategy often failed; for example, when the price of the produce decreased, Maxsun Produce would be left with an enormous excess of food that had to be thrown away. *Id.* In 2012, Maxsun Produce stopped paying its creditors and

vendors, and shortly thereafter, on May 11, 2013, Maxsun Produce filed a chapter 7 voluntary petition, reporting only $70,833 in assets.[5] Voluntary Petition, Case No. 13-42875-nhl, ECF No. 1; 2/11/19 Tr. 130:5-10.

During the same time that Maxsun Produce's business woes accelerated, Micarole's income increased. Pl's Ex. 19. Specifically, between 2011 and 2013, Micarole's income grew from $293,761 to $444,253. Pl's Ex. 19, D11330, D11641. Lin testified this can be attributed to the fact that once he resigned from Maxsun Produce, he was able to focus on Micarole, leading to increased profits. 1/31/19 Tr. 150:16-25.

## DISCUSSION

### I.  Statute of Limitations

As a preliminary matter, the Plaintiff and Defendants disagree as to the appropriate statute of limitations. As detailed *infra*, the statute of limitations imposed by non-bankruptcy law with respect to all independent causes of action in the Complaint is six years. *See infra* Part II-IV. Here, the Plaintiff filed the instant complaint on March 16, 2017, which means transactions that occurred prior to March 16, 2011, are barred by the statute of limitations.[6] However, the Plaintiff asserts that the Court may invoke the doctrine of equitable estoppel because "it is well settled that 'equitable estoppel prevents a fiduciary from using the statute of limitations to prevent a claim of

---

[5] The court takes judicial notice of the bankruptcy docket. *See* Case No. 13-42875-nhl.

[6] Because the Trustee did not commence this action until approximately four years after the petition date, he cannot avail himself of 11 U.S.C. § 108(a), which provides that if applicable non-bankruptcy law provides a statute of limitations, and such period has not expired by the petition date, the Trustee may commence an action at:

> (1)  the end of such period, including any suspension of such period occurring on or after the commencement of the case; or
> (2)  **two years after the order for relief**.

11 U.S.C. § 108(a) (emphasis added).

misconduct.'" Pl.'s Post-Trial Mem. at 8 (citing *Banco De Desarrollo Agropecuario, S.A. v. Gibbs*, 709 F. Supp. 1302, 1310 (S.D.N.Y. 1989)).

Under New York law,[7] the doctrine of equitable estoppel may prevent a defendant from pleading a statute of limitations defense "where it is the ***defendant's affirmative wrongdoing*** . . . which ***produced the long delay*** between the accrual of the cause of action and the institution of the legal proceeding." *Gen. Stencils v. Chiappa*, 18 N.Y.2d 125, 128 (N.Y. 1966) (emphasis added); *see Doe v. Kolko*, Nos. 06-CV-2096 (SLT)(MDG), 2008 WL 4146199, at *4 (E.D.N.Y. Sept. 5, 2008) ("Equitable estoppel is appropriate where the plaintiff is prevented from filing an action within the applicable statute of limitations due to defendants' misconduct toward the potential plaintiff . . . .").  Some courts have found that when the party seeking the statute of limitations defense is a fiduciary of the plaintiff, the doctrine also applies if the fiduciary "concealed facts which he was required to disclose, that the plaintiff relied on the misrepresentation and that the reliance caused plaintiff to delay bringing timely action." *Kaufman v. Cohen*, 760 N.Y.S.2d 157, 167 (N.Y App. Div. 2003); *Abercrombie v. Andrew Coll.*, 438 F.Supp.2d 243, 265 at n. 23 (S.D.N.Y. 2006).

Importantly, the doctrine does not apply "where the misrepresentation or act of concealment underlying the estoppel claim is the same act which forms the basis of plaintiff's underlying cause of action" because otherwise "the mere assertion of an underlying fraudulent act would always trigger equitable estoppel." *Abercrombie*, 438 F.Supp.2d at 265–66 (internal quotations omitted); *see Smith v. Smith*, 830 F.2d 11, 13 (2d Cir. 1987) ("The doctrine of equitable estoppel usually

---

[7] Here, the Court applies New York law because the substantive causes of action are New York state-law actions; namely, (i) breach of fiduciary duty pursuant to N.Y. Bus. Corp. Law § 717(a) and 715(h), (ii) fraudulent conveyances under NYDLC §§ 273, 274, and 275, and (iii) unjust enrichment under New York law. *See In re Signature Appeal Grp LLP*, 577 B.R. 54, 83-85 (Bankr. S.D.N.Y. 2017) (applying New York equitable estoppel law with respect to New York state law actions).

comes into play when some conduct by a defendant after his initial wrongdoing has prevented the plaintiff from discovering or suing upon the initial wrong."); *Bobash, Inc. v. Festinger*, 868 N.Y.S.2d 747 (N.Y. App. Div. 2008) (holding that equitable estoppel argument did not apply to constructive fraud claims under the NYDCL because the claim was based on same allegations as underlying fraud claims). Moreover, equitable estoppel should be "invoked sparingly and only under exceptional circumstances." *Beckles v. George*, No. 07 CV 0584(RJD)(LB), 2008 WL 926578, at *4 (E.D.N.Y. Mar. 31, 2008) (internal quotations omitted).

In making this argument, the Plaintiff relies solely on the alleged misconduct underlying the causes of action in the Complaint and the argument that Lin cannot benefit from the statute of limitations since he, as a fiduciary, was the party charged in law with the duty of asserting the claims before the statute ran. *See* Pl.'s Post-Trial Mem. at 8–9 (first citing *Banco De Desarrollo Agropecuario*, 709 F. Supp. at 1310; then citing *A.F.L. Falck, S.p.A. v. E.A. Karay Co.*, 722 F.Supp. 12, 16–17 (S.D.N.Y. 1989)). The Court finds this argument, on its own, to be insufficient. The Plaintiff has not provided evidence that any of the Defendants (i) made an affirmative misrepresentation, or (ii) assuming, *arguendo*, that Lin is a fiduciary, concealed facts that caused the Plaintiff's delay in bringing the Complaint. *See Abercrombie*, 438 F.Supp.2d at 265–66; *Gen. Stencils*, 18 N.Y.2d at 128. In other words, by merely relying on the underlying alleged misconduct, the Plaintiff has not provided sufficient evidence that he relied on an affirmative misrepresentation or a concealed fact, and that such reliance prevented him from asserting the Complaint. *Compare Kaufman*, 760 N.Y.S.2d at 167 (finding equitable estoppel did not apply where the "very same wrongful act . . . form[ed] the basis of both the estoppel argument and the underlying claims for fraud and breach of fiduciary duty"), *with In re J&D Sciences, Inc*, 335 B.R. 791, 797–99 (Bankr. M.D. Fla. 2006) (equitably tolling a statute of limitations where the

debtor and its president concealed assets in the schedules and statements and the Trustee delayed bringing an avoidance action because he relied on the inaccurate documents).

Consequently, the Court will not apply the doctrine of equitable estoppel to bar a statute of limitations defense in response to the Complaint.[8]

## II.    Breach of Fiduciary Duty

In the first cause of action, the Plaintiff asserts that Lin, as an "insider, officer, principal and/or shareholder of the Debtor" breached his fiduciary duties to Maxsun Produce "by instigating, permitting, and participating in the improper depletion of Debtor's funds and assets for the purpose of enriching himself and defrauding Debtor and the Debtor's creditors." Compl. ¶¶ 43–44.

Under New York law, a prima facie case for breach of fiduciary duty requires a showing of "(1) the existence of a fiduciary duty between plaintiff and defendant, (2) the breach of that duty by defendant, and (3) damages as a result of that breach." *Sung-Ho Hwang v. Grace Road Church*, 14-CV-7187(KAM)(RML), 2017 WL 10398718, at *5 (E.D.N.Y. Sep. 19, 2017) (citing *Margrabe v. Sexter & Warmflash*, P.C., 353 F. App'x 547, 549 (2d Cir. 2009)). Here, the breach of fiduciary duty claim is governed by a six-year statute of limitations because the claim is based on the theory that Lin defrauded the Debtor. *See IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 907 N.E.2d 268, 272 (N.Y. 2009) ("[W]here an allegation of fraud is essential to a breach of fiduciary duty claim, courts have applied a six-year statute of limitations under CPLR 213(8).") (internal citations omitted).

---

[8] While it appears the Plaintiff only invoked this argument with respect to the breach of fiduciary duty claim, the Court finds, regardless, that the Plaintiff has not provided sufficient evidence that equitable estoppel applies to *any* of the claims in the Complaint.

### A.  Duty

In order to hold a defendant liable for a breach of fiduciary duty claim, the Court must first find that the defendant owed the plaintiff a fiduciary duty. *Sung-Ho Hwang*, 2017 WL 10398718, at *5. Here, the Plaintiff contends that Lin owed the Debtor a fiduciary duty at all relevant times because he never properly resigned as Director or Secretary, and thus should be "held to a standard 'stricter than the morals of the market place' '[n]ot honesty alone, but the punctilio of an honor the most sensitive . . .'" Pl.'s Post-Trial Mem. at 8 (quoting *Meinhard v. Salmon*, 164 N.E. 545, 546 (N.Y. 1928)). While the Defendants agree that Lin was a fiduciary prior to August 16, 2010, the Defendants disagree that he owed any duty thereafter, contending that Lin resigned from *all* roles at Maxsun Produce on that date. Def.'s Post-Trial Mem. at 16–17.

In general, a fiduciary duty exists "between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." *Brown Media Corp. v. K&L Gates, LLP*, 586 B.R. 508, 523 (E.D.N.Y. 2018) (quoting *Eurycleia Partners, LP v. Seward & Kissel, LLP*, 910 N.E.2d 976, 12 N.Y.3d 553, 883 N.Y.S.2d 147 (N.Y. 2009)). A fiduciary duty may arise through statute or contract, or through the circumstances of the underlying relationship between the parties. *See EBC I, Inc v. Goldman, Sachs & Co.*, 832 N.E.2d 26, 31 (N.Y. 2005).

### i.    Duty as Director and Officer

Under New York law, directors and officers owe a fiduciary duty to the corporation and its shareholders, including the duty of due care and loyalty. N.Y. Bus. Corp. Law § 717(a);[9] N.Y.

---

[9] N.Y. Bus. Corp. Law § 717(a) provides that, "[a] director shall perform his duties as a director, including his duties as a member of any committee of the board upon which he may serve, in good faith and with that degree of care which an ordinarily prudent person in a like position would use under similar circumstances."

BUS. CORP. LAW § 715(h);[10] *In re Mundo Latino Mkt., Inc.*, 590 B.R. 610, 616–17 (Bankr. S.D.N.Y. 2018). "The duty of care refers to the responsibility of a corporate fiduciary to exercise, in the performance of his tasks, the care that a reasonably prudent person in a similar position would use under similar circumstances . . . The second restriction traditionally imposed, the duty of loyalty, derives from the prohibition against self-dealing that inheres in the fiduciary relationship." *Norlin Corp. v. Rooney, Pace Inc*., 744 F.2d 255, 264 (2d Cir. 1984); *see U.S. Small Bus. Admin. v. Feinsod*, 347 F.Supp.3d 147, 158 (E.D.N.Y. 2018).

Once a director or officer resigns, his or her fiduciary duties will generally cease, although the party may still be liable for wrongful acts committed, or set in motion, while in office. *See Xerox Corp. v. Genmoora Corp*., 888 F.2d 345, 355 (5th Cir. 1989) (finding that although fiduciary duties generally cease upon termination, a former director could still be liable if he or she knew a dangerous transaction was "about to occur but [took] no steps to prevent it"); *Armenian Assembly of America, Inc. v. Cafesjian*, 772 F.Supp.2d 20, 105 (D.D.C. 2011) ("When a corporate officer ceases to act as such . . . because of his or her resignation or removal from office . . .  the fiduciary relationship ceases.") (quoting 3 William Meade Fletcher, Fletcher Cyclopedia of the Law of Corporations § 860); *Schroeder v Pinterest Inc*.,133 A.D.3d 12, 23 (N.Y. App. Div. 2015) ("[A] director who has resigned or has been terminated no longer owes fiduciary duties to the company.").

Absent a provision in the corporate documents to the contrary, a director or officer may generally resign at will, and need not provide written notice. *See Zeltner v. Henry Zeltner Brewing Co*., 66 N.E. 810, 812 (N.Y. 1903) ("[A]s a general rule, such officers may resign at will."); *Fearing v. Glynn* 73 F. 116, 118 (2d Cir. 1896) ("Unless there is some provision in the charter or

---

[10] N.Y. Bus. Corp. Law § 715(h) provides that, "[a]n officer shall perform his duties as an officer in good faith and with that degree of care which an ordinarily prudent person in a like position would use under similar circumstances."

by-laws to the contrary . . . [a director] can renounce his agency at will, can manifest his purpose by oral notice as well as by a formal written resignation.").

Here, the Court finds that while Lin owed fiduciary duties to Maxsun Produce before August 16, 2010—the day he submitted his written resignation as President—he was no long a fiduciary of Maxsun Produce after his resignation. While the Court understands that Lin never provided a written resignation for the positions of Secretary and Director, *see* Pl. Ex. 10, Pl.'s Ex. 11, this was not explicitly required under the Shareholders' Agreement or any other corporate documents produced at trial. *See* Pl.'s Ex. 2. The Court is persuaded by Lin's credible explanation and witness demeanor, under oath, that his resignation on August 16, 2010, was intended by him to terminate his management duties and *all* of his director and officer roles at Maxsun Produce.

Lin's actions after August 16, 2010, as well as the evidence and testimony of Lin and Cho at trial, support this finding.  For example, Maxsun Produce's 2010 tax return provides that during the period from October 1, 2010 through September 30, 2011, the Debtor's officers were Cho, Qi, and Chen. Pl.'s Ex. 20. Further, there is no evidence that Lin undertook responsibilities for Maxsun Produce after his resignation, or in any manner affirmatively represented himself to be a director or officer of the company. *See* 1/31/19 Tr. 144:1-9. Cho's testimony also supports this conclusion, as he claimed that he did not see Lin control or access the company finances after his resignation. *See* 2/11/19 Tr. 157:4-10. *Compare Dionisi v. DeCampli*, No. 9425, 1995 WL 398536, *8 (Del. Ch. June 28, 1995) (finding that a party stepped down from all director and officer roles and was no longer a fiduciary where the party announced his resignation and thereafter no longer participated in managing the corporation), *with Armenian Assembly of America, Inc.*, 772 F.Supp.2d at 105 (finding that a director was still a fiduciary, despite termination of the role,

because he "continued to assert his rights as [director] and never severed his relationship with the organization").

Although Lin visited the business premises after his resignation, this can be attributed to the fact that Micarole and Maxsun Produce continued to share a warehouse until approximately March 2011. 2/8/19 Tr. 60:19-20. Moreover, while Lin remained an authorized signatory for Maxsun Produce's bank account until May 2011, he testified that this was inadvertent, and affirmed that he did not sign any checks on behalf of Maxsun Produce after his resignation. D's Ex. M; 2/11/19 Tr. 170:3-10. Further, while the company's PACA license still listed Lin as a principal even after August 2010, Lin explained that he assumed it was Maxsun Produce's responsibility to update the license. 2/8/19 Tr. 55:2-14.

The Court also finds Lin's testimony about his understanding of the director and officer positions credible. Lin explained that due to the size of the business, he understood his sole role to be President and "when [he] resign[ed] the president, to [his] understanding, [he] resign[ed] [from] everything." 1/31/19 Tr. 78:9-11, 80:5-6; *see id*. 50:20-21 ("I'm not familiar with this kind positions [sic]. I just, small company only have the one [sic], which is the president; I understand that."). This finding is also supported by Cho's testimony that he did not know who the Secretary was. 2/11/19 Tr. 122:6-7.

Accordingly, the Court finds that the testimony and actions of the relevant parties sufficiently evidence that Lin stepped down from all positions at Maxsun Produce on August 16, 2010. Because Lin resigned from all positions on this date, the Court finds that his fiduciary duties as director and officer terminated at this point. *See Xerox Corp.*, 888 F.2d at 353.

       *ii.*       *Fact Intensive Inquiry*

As noted, in addition to fiduciary duties that arise by statute or contract, a party may owe a fiduciary duty based on the circumstances of the underlying relationship between the parties. *See Lehman Bros. Com. Corp. v. Minmetals Int'l. Non-Ferrous Metals Trading Co*., 179 F.Supp.2d 118, 151 (S.D.N.Y. 2000). In determining whether such relationship exists, "New York courts conduct a fact-specific inquiry into whether a party reposed confidence in another and reasonably relied on the other's superior expertise or knowledge." *Brown Media Corp.*, 586 B.R. at 528 (quoting *Facella v. Fed'n of Jewish Philanthropies of N.Y., Inc*., No. 98-cv-3146, 2004 WL 1700616, at *6 (S.D.N.Y. July 30, 2004)).

For the same reasons set forth above, the Court finds that Lin owed no fiduciary duty to Maxsun Produce after his resignation. As delineated, Lin testified that he was unaware of and did not take part in the day-to-day operations of Maxsun Produce after he stepped down. *See* 2/11/19 Tr. 170:3-10; 1/31/19 Tr. 143:18-144:4. As such, the Plaintiff has not provided sufficient facts evidencing that after Lin's resignation, Maxsun Produce reposed confidence in Lin and relied on his expertise or knowledge such that a fiduciary relationship existed. *See Brown Media Corp.*, 586 B.R. at 528.

### B.  Breach of Duty

Even if a party has resigned as a director or officer, he or she may still be liable for wrongful acts committed, or set in motion, while in such a position. *See Xerox Corp.*, 888 F.2d at 353. The Plaintiff has asserted that Lin breached his fiduciary duties of loyalty and care by (i) engaging in self-dealing through various intercompany transactions, (ii) engaging in deceit due to the alleged sham transfer of shares with Chen, (iii) resigning as President without providing adequate protection for the Debtor and thus failing to prevent misconduct and, (iv) as an alternative to (ii),

engaging in corporate waste by transferring his corporate stock without adequate consideration. Pl.'s Post-Trial Mem. at 8.

As noted, directors and officers owe a duty of due care and loyalty to the corporation and its shareholders. N.Y. BUS. CORP. LAW § 717(a); N.Y. BUS. CORP. LAW § 715(h); *see In re Mundo Latino Mkt., Inc.*, 590 B.R. at 616–18. However, the business judgment rule "bars judicial inquiry into actions of corporate directors taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes." *Auerbach v. Bennett*, 393 N.E.2d 994, 1000 (N.Y. 1979); *see id.* ("The authority and responsibilities vested in corporate directors both by statute and decisional law proceed on the assumption that inescapably there can be no available objective standard by which the correctness of every corporate decision may be measured, by the courts or otherwise"). As such, under this standard, courts generally do not second guess the business decisions of directors and officers. *See Joy v. North,* 692 F.2d 880, 885 (2d Cir. 1982) ("[L]iability is rarely imposed upon corporate directors or officers simply for bad judgment . . . .").

Here, the Court need not analyze the asserted breaches of duty, because the alleged conduct either occurred (i) before March 16, 2011, and is therefore barred by the six-year statute of limitations, or (ii) after August 16, 2010, when Lin was no longer a fiduciary of the Debtor.

The Plaintiff filed the instant complaint on March 16, 2017, and thus transactions that occurred prior to March 16, 2011, are barred by the statute of limitations. The majority of the Plaintiff's breach of fiduciary duty arguments are with respect to conduct that occurred before March 16, 2011, and are thus time barred. For example, the appointment of Qi as President occurred on August 16, 2010, and therefore this conduct is barred even assuming, *arguendo*, such actions constituted a breach of fiduciary duty. *See* Pl.'s Ex. 11. The allegations that Lin engaged in self-

dealing by hiring his niece as a bookkeeper, and by causing the Debtor to pay higher than market prices for used equipment are time barred as well—these actions allegedly occurred during Lin's time as President, and therefore well before March 16, 2011, given that Lin resigned from this position on August 16, 2010. 2/11/19 Tr. 122:10-25, 160:3-16. ("[Defendant's Counsel]: When did [the equipment transfer] occur? . . . Mr. Cho: When [Lin] was President."). The self-dealing allegations based on the intercompany transfers occurred in 2008 and 2009, *see* 1/31/19 Tr. 43:1-6, 44:1-5, 53:11-20, and the transfer of shares between Lin and Maxsun International and/or Yi Chen occurred on September 7, 2010. *See* Pl.'s Ex. 13. Because such actions occurred prior to March 16, 2011, Lin cannot be found liable for a breach of fiduciary duty with respect to this conduct.

The balance of the Trustee's breach of fiduciary duty arguments—that is, Lin's failure to exercise reasonable diligence to correct and prevent Qi's misconduct as President—arguably occurred up until the Debtor's bankruptcy filing in 2013, and are thus not barred by the statute of limitations. However, during this time, Lin was no longer a fiduciary because he had already resigned from Maxsun Produce. *See supra*. As such, Lin cannot be held liable for a breach of fiduciary duty with respect to this conduct. *See In re Mundo Latino Mkt., Inc.*, 590 B.R. at 616–17.

Even if Lin remained a fiduciary or remained liable under the theory that his actions as director and officer somehow set Qi's business decisions in motion, this conduct would not constitute a breach. At bottom, Maxsun Produce engaged in risky business tactics that ultimately failed. *See* 2/11/19 Tr. 129:7-17. Qi, who had been in the business of produce sales for over ten years at a reputable company, had a business strategy—to purchase surplus produce with the expectation that prices would increase, leading to substantially higher profits. *See id*. There is nothing unlawful

or illegitimate about this strategy and thus, under the business judgment rule, the fact that this strategy ultimately failed should not result in the directors and officers being liable for a breach of fiduciary duty.[11] *See Joy,* 692 F.2d at 885; *Auerbach*, 393 N.E.2d at 1000–01. In support of his contention that a breach occurred, the Plaintiff cites *Gully v. Nat'l Credit Union Admin. Bd.,* where the Second Circuit affirmed a finding that a manager breached her fiduciary duty by failing to prevent misuse of a corporate credit card and by failing to monitor the credit card use after learning about the misconduct. 341 F.3d 155, 165–66 (2d Cir. 2003). This case is clearly distinguishable. As an initial matter, Lin testified that he was unaware of the Debtor's operations after he resigned. 1/31/19 Tr. 144:9 ("I didn't know any [sic] about their operation."). Further, as noted by the *Gulley* court, the conduct in that case involved the *illegal* abuse of a corporate credit card. *Gulley*, 341 F.3d at 165. While Qi's actions were risky, there is no evidence he engaged in illegal conduct and, as such, his actions are not comparable to the underlying illegal conduct in *Gulley*.

Accordingly, Lin cannot be held liable for a breach of fiduciary duty claim with respect to any of the arguments raised by the Plaintiff and the relief sought based upon this cause of action is denied.

**III.**  **Fraudulent Conveyance**

The Plaintiff's second, third, and fourth causes of action allege that the Defendants engaged in constructive fraudulent transfers in violation of NYDLC §§ 273, 274, and 275[12], and the Plaintiff seeks a judgment "(a) avoiding, preserving and recovering the Transfers, (b) directing that the

---

[11] The Court understands that not all business transactions are subject to the business judgment rule and that in instances where the director is not disinterested, the entire fairness standard applies. *See In re Perry H. Koplik & Sons, Inc.*, 499 B.R. 276, 289 (S.D.N.Y. 2013). However, the Plaintiff did not raise the argument that Lin is subject to the entire fairness standard.

[12] On December 6, 2019, New York amended the NYDCL by enacting the New York Uniform Voidable Transactions Act ("UVTA") which took effect on April 4, 2020. By its terms, the UVTA governs transfers made and obligations incurred after April 4, 2020, and thus is not applicable to this Complaint, which was filed on March 16, 2017.

Transfers be set aside, or (c) alternatively, awarding the Trustee judgment in the amount of the value of the Transfers." *See* Compl. ¶¶ 51, 56, 61.[13] The Plaintiff alleges that under Lin's control "the Debtor's funds and assets were depleted for the benefit of Lin, leaving the Debtor's creditors unpaid" and "[t]he transfers of the Debtor's funds and assets, for the benefit of Lin, were done without fair consideration and while the Debtor was insolvent and/or caused the Debtor to become insolvent by those transfers." Compl. ¶¶ 39–40. In response, the Defendants argue that the Plaintiff has failed to point to *any* transaction after March 16, 2011 (i.e., within the six-year statute of limitations) evidencing a transfer from Maxsun Produce to the Defendants. Def's Post-Trial Mem. at 21–22.

Under New York law, a party challenging a transfer of the debtor's property as constructively fraudulent must show that the transfer "was made without fair consideration and (1) the debtor was insolvent or was rendered insolvent by the transfer, [NYDCL § 273], (2) the debtor was left with unreasonably small capital, [NYDCL § 274], or (3) the debtor intended or believed that it would incur debts beyond its ability to pay when the debts matured. [NYDCL § 275]." *In re Nirvana Rest., Inc*. 337 B.R. 495, 501 (Bankr. S.D.N.Y. 2006); *see Geron v. Schulman (In re Manshul Constr. Corp.)*, No. 96B44080(JHG), 2000 WL 1228866, at *51 (S.D.N.Y. Aug. 30, 2000). A constructive fraudulent conveyance claim must be "brought within six years from the date of the conveyance." *In re Allou Distribs. Inc.*, 446 B.R. 32, 67 (Bankr. E.D.N.Y. 2011).

The Court finds that the Plaintiff has not met his burden under these causes of action because the Plaintiff has failed to point to a specific transfer from Maxsun Produce to the Defendants during the six-year period, let alone a transfer made without fair consideration. The Plaintiff primarily points to the fact that the Debtor's assets significantly decreased between 2011 and 2013, and

---

[13] The Court takes note that the Plaintiff failed to brief these causes of action in his post-trial memorandum.

Micarole's income increased during this same time. However, this fact, on its own, is insufficient to satisfy even the first element of the fraudulent conveyance tests set forth in the relevant NYDLC provisions. *See* NYDLC §§ 273, 274, 275 (requiring a transfer). This conclusion is also supported by the business ledgers of Micarole and the Debtor and the testimony of accountant Cheng, which do not evidence that the Defendants and the Debtor engaged in business transactions in the relevant six-year period. *See* Pl's Ex. 31; Pl's Ex. 26; 2/11/19 Tr. 88:11-13.

Because there is no evidence of a transfer within the necessary timeframe, there is no reason to analyze the other elements under NYDLC §§ 273, 274, and 275. As such, the Plaintiff has not met his burden to establish these claims by a preponderance of the evidence and causes of action two through four are denied.

### IV.    <u>Unjust Enrichment</u>

The Plaintiff's fifth cause of action seeks a judgment against all Defendants on the theory of unjust enrichment. The Plaintiff contends that all Defendants "have taken the value and benefits of the assets and proceeds of the Debtor's business" and thus the "Defendants have been unjustly enriched at the expense of Debtor's estate." Compl. ¶¶ 63–64.[14] The Defendants argue that the Plaintiff has failed to provide *any* evidence that the Defendants benefitted at the Debtor's expense within the six-year statute of limitations. *See* Def.'s Post-Trial Mem. at 23. Rather, the Debtor's downfall was premised on Qi's risky business tactics. *See id.* at 13. Moreover, the Defendants contend that the increase in Micarole's income is attributable to the fact that Lin had more time to focus on Micarole. *Id.* at 11.

Unjust enrichment is a quasi-contract claim, meant to rectify instances where one party has unfairly benefitted at the expense of another. *See Goldman v. Metropolitan Life Ins. Co.*, 841

---

[14] The Court notes that, like the fraudulent conveyance claims, the Plaintiff did not include an argument under unjust enrichment in his post-trial memorandum.

N.E.2d 742, 746 (N.Y. 2005).  Under New York law, the elements of unjust enrichment are "(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." *Beth Israel Med. Center v. Horizon Blue Cross and Blue Shield of N.J., Inc.*, 448 F.3d 573, 586 (2d Cir. 2006) (internal citations omitted). Accordingly, "[t]he receipt of a benefit alone . . .  is insufficient to establish a cause of action for unjust enrichment." *Wiener v. Lazard Freres & Co.*, 672 N.Y.S.2d 8, 13 (N.Y. App. Div 1998). The statute of limitations for an unjust enrichment action under New York law is six years. *See Golden Pacific Bancorp v. FDIC,* 273 F.3d 509, 518 (2d Cir.2001); *Malmsteen v. Berdon, LLP*, 477 F.Supp.2d 655, 667 (S.D.N.Y. 2007).

While it is clear that Maxsun Produce's assets significantly decreased between 2011 and 2013, and Micarole's income increased during the same period, the Plaintiff has failed to draw a connection between these two occurrences. Thus, although Micarole and Lin, as 100% owner of Micarole, benefited during these two years, the Plaintiff has not provided facts evidencing that this benefit was at the expense of Maxsun Produce. *Wiener*, 672 N.Y.S.2d at 13. Accordingly, because the second element of the unjust enrichment test is not satisfied, the relief sought in the Plaintiff's fifth cause of action is denied.

## V.    Alter Ego/Piercing the Corporate Veil[15]

Last, the Plaintiff argues that he is entitled to a judgment against the Defendants under an alter ego theory. The Plaintiff contends that "[a]s a result of Lin being liable for breach of fiduciary duty, the Trustee is entitled to judgment against the remaining Defendants, which are his wholly-owned entities . . . ." Pl.'s Post-Trial Mem. at 19.  The Defendants counter that the Plaintiff failed to provide evidence that Lin had control over the Debtor within the six-year statute of limitations,

---

[15] Under New York law, "alter ego" and "veil piercing" claims are synonymous. *CSX Transp., Inc. v. Filco Carting, Corp.*, 2011 WL. 2713487, *3 at n.1 (E.D.N.Y. July 11, 2011).

and that the Plaintiff has not provided evidence of any wrongful or unjust act causing injury to the Debtor. Def.'s Post-Trial Mem. at 32.

A basic tenet of corporate law is that the corporation, not its owners, are liable for corporate acts. *Michael v. Bank*, 959 F.Supp.2d 144, 245 (N.D.N.Y. 2013). However, an owner may be liable for the acts of a corporation when the corporate veil has been pierced, which, under New York law, requires a showing that (1) "the owner exercised complete domination over the corporation with respect to the transaction at issue," such that the owner is an alter ego of the corporation, and (2) "such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil." *MAG Portfolio Consultant, GMBH v. Merlin Biomed Grp. LLC*, 268 F.3d 58, 63 (2d Cir. 2001) (quoting *Am. Fuel Corp. v. Utah Energy Dev. Co.,* 122 F.3d 130, 134 (2d Cir.1997)).

Importantly, "New York does not recognize an independent cause of action to pierce the corporate veil; rather 'it is an assertion of facts and circumstances which will persuade the court to **impose the corporate obligation on its owners**.'" *Feitshans v. Kahn*, No. 06 Civ. 2125(SAS), 2006 WL 2714706, at *3 (S.D.N.Y. 2006) (emphasis added) (quoting *Morris v. New York State Dept. of Taxation & Fin.*, 82 N.Y.2d 135, 140 (N.Y. 1993)). As such, an alter ego claim is not a separate claim, but a means of imposing liability stemming from an underlying cause of action. *See VA C 12266 Jefferson, LLC v. Mattress Warehouse Inc.*, Civil No. 4:14cv34, 2014 WL 5311453 (E.D. Va. Oct. 16, 2014) ("Since Plaintiffs' breach of contract claim is dismissed, its alter ego claim has no cause of action on which to rest."); *Feitshans*, 2006 WL 2714706, at *3 (S.D.N.Y. 2006); *9 E. 38th St. Assocs., L.P. v. George Feher Assocs., Inc.*, 640 N.Y.S.2d 520, 521 (1st Dep't 1996) ("[A] separate cause of action to pierce the corporate veil does not exist independent from the claims asserted against the corporation.").

Because the Court has denied the Plaintiff's relief with respect to all of the independent causes of action, there is no longer a claim upon which the alter ego cause of action can rest. *See VA C 12266 Jefferson, LLC*, 2014 WL 5311453; *Feitshans v. Kahn*, 2006 WL 2714706. Thus, this cause of action must be denied.

## <u>CONCLUSION</u>

Accordingly, for the foregoing reasons, the relief sought in the Complaint is hereby denied and this adversary proceeding is dismissed.

**Dated: April 24, 2020**
    **Brooklyn, New York**

**Nancy Hershey Lord**
**United States Bankruptcy Judge**